UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————————————————

ANIBAL QUINONES,

                              Plaintiff,

          -against-

NEW YORK CITY, *et al.*,

                              Defendants.

19cv05400 (LJL) (DF)

**REPORT AND
RECOMMENDATION**

**TO THE HONORABLE LEWIS J. LIMAN, U.S.D.J.:**

     In this *pro se* action, which has been referred to this Court for general pretrial supervision

and to report and recommend on dispositive motions, plaintiff Anibal Quinones ("Plaintiff") has

asserted claims against defendants New York City (the "City") and Corrections Officer

Artisha Bishop[1] ("Bishop") (collectively, "Defendants")[2] under both Title VII of the Civil Rights

Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII"), and 42 U.S.C. § 1983

("Section 1983").  As set out in more detail below, Plaintiff's claims arise out of events that

occurred while he was being held in City custody at the Manhattan Detention Complex (the

"MDC" or the "Facility"), where he worked in the Facility's kitchen.  He essentially contends

that his First Amendment right to free speech was violated by a work supervisor who did not

permit him to speak in Spanish on the job, and that, after he filed a grievance about this, he was

fired from his kitchen job for discriminatory and/or retaliatory reasons.

_____

     [1] Although, in his Complaint, Plaintiff identified Officer Bishop only by her surname, her
first name has since been provided by counsel.  (*See* Dkt. 16.)

     [2] In his Complaint, Plaintiff also named the New York City Department of Correction
("DOC") as a defendant, but, by Order dated July 17, 2019, the Honorable Valerie E. Caproni,
U.S.D.J., to whom the case was then assigned, dismissed Plaintiff's claims against this
defendant, based on the fact that an agency of the City may not be sued.  (*See* Dkt. 8, at 2.)

Currently before the Court is a motion by Defendants, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, seeking dismissal of the Complaint, in its entirety, for failure to state a claim. For the reasons discussed below, I recommend that Defendants' motion be granted, but that Plaintiff be permitted to amend his Complaint to cure the defects in certain of his claims.

## BACKGROUND

### A.   Factual Background

Liberally construed, Plaintiff's Complaint, dated May 30, 2019 ("Compl.") (Dkt. 2), alleges the following facts, which are taken as true for the purposes of this motion:

On January 10, 2019, Plaintiff was detained at MDC (Compl., at ECF 23[3]), apparently for a parole violation (*id.,* at ECF 5). In February of 2019, Plaintiff began working in the kitchen at the Facility, where, purportedly, he regularly spoke Spanish with his fellow detainees or inmates[4] and the officers who oversaw them. (*Id*. at ECF 23.) On or about the third week of February, defendant Bishop was assigned to supervise Plaintiff in the kitchen, and, according to Plaintiff, Bishop then proceeded to make the kitchen work environment "hostile" and a "nightmare." (*Id*.) Plaintiff alleges that, in the weeks following Bishop's arrival in the kitchen, despite no posted policy in the kitchen forbidding the inmates from speaking Spanish, Bishop demanded that the inmates "not [] speak Spanish to one another" (emphasis omitted), and would make such demands even of inmates who spoke only Spanish. (*Id.* at ECF 23, 25.) Apparently,

---

[3] Where pages of filed submissions are cited herein as "ECF __," the citations are to the page numbers affixed to the documents by the Court's Electronic Case Filing system.

[4] Although the MDC is a detention center, Plaintiff repeatedly refers in his Complaint to other "inmates," and, although he may have intended to refer to other "detainees," this Court will generally adopt his terminology here.

some inmates were relieved of their kitchen duties, and others voluntarily quit "because of Bishop's attitude towards the way she spoke to others." (*Id.* at ECF 23.)

On March 2, 2019, while working in the kitchen, Plaintiff asked, in Spanish, for one of the officers (who allegedly himself spoke Spanish) to pass him plastic bags used for preparing utensils for meals. (*Id.*) Upon hearing Plaintiff speak in Spanish, Bishop "told [Plaintiff] to get [his] personal belongings because [he] was going back to his housing unit[,] because he spoke in [S]panish." (*Id.*) Plaintiff alleges that he responded to Bishop that sending him back to his housing unit was "unconstitutional," that what he said to the other officer was not a "security matter," and that he and the other officer "would speak in [S]panish all the time." (*Id.*)

When Plaintiff returned to his housing unit, he reported Bishop's conduct to 311 and filed a grievance with MDC. (*Id.* at ECF 25.) Plaintiff then returned to work on March 3, and apparently continued his duties until March 6, without any admonishment from Bishop. (*Id.*) When Plaintiff tried to go to work on March 9, however, he was told by another officer that he was not allowed to work, although he was not told why. (*Id.*) Later, at an unspecified time, Plaintiff was notified that he had been fired from his job; Plaintiff alleges that he "found out that since [he] filed the grievance against [Bishop,] [he was] fired." (*Id.*)

### B.    Procedural History

Plaintiff filed his *pro se* Complaint on May 30, 2019,[5] naming the City, the DOC, and Bishop as defendants. (*See id.*) As noted above (*see supra*, at n.2), the DOC was dismissed from the case by Order dated July 18, 2019 (Dkt. 8). As against the City and Bishop, the

---

[5] Under the so-called "prison mailbox rule," A *pro se* prisoner's papers are deemed filed when they are handed over to prison officials for forwarding to the Court. *See Houston v. Lack,* 487 U.S. 266 (1988). As the Complaint indicates that it was delivered for mailing as of May 30, 2019 (Compl. at ECF 21), the Court will treat the Complaint as filed as of that date.

Complaint, liberally construed, raises (1) a Title VII claim against the City, for allegedly subjecting him to a "hostile work environment" in the course of his employment at the Facility; (2) a Section 1983 claim against Defendants, for allegedly violating his First Amendment rights by forbidding him to speak in Spanish, and for allegedly retaliating against him for filing a grievance regarding Bishop's conduct.  (*See id.* at ECF 25; *see also id.* at ECF 27, 29.)

After Defendants informed this Court, by letter dated October 9, 2019, that it anticipated filing a motion to dismiss the Complaint (*see* Dkt. 16), this Court set a schedule for the motion and stayed discovery pending its resolution (Dkt. 19).  Three days before the motion was due to be filed, however, the Court received a letter from Plaintiff, in which he requested leave to amend his Complaint "so that [he could] correct any [deficiencies] to the initial [Complaint]." (Dkt. 26.)  Plaintiff did not explain which "deficiencies" he sought to correct, nor did he attach a proposed amended complaint.  (*Id.*)  Nor, when Defendants proceeded to file their motion, directed towards Plaintiff's original Complaint, did Plaintiff, in response, propose a particular amendment to remedy any pleading defect that Defendants identified.  Rather, as noted below, he merely filed an opposition.

Defendants filed their motion to dismiss on December 9, 2019, asserting that Plaintiff's claims should be dismissed in their entirety.  (*See* Notice of Motion, dated Dec. 9, 2019 (Dkt. 23); Memorandum of Law in Support of Defendants' Motion to Dismiss the Complaint, dated Dec. 9, 2019 (Dkt. 24) ("Def. Mem."); Affirmation of Service, dated Dec. 9, 2019 (Dkt. 25).)  Plaintiff timely filed his opposition on January 20, 2020 (Opposition of Notice of Motion, dated Jan. 20, 2020 ("Pl. Opp.") (Dkt. 27)), and the City filed a reply brief on February 6, 2020, (*see* Reply Memorandum of Law in Further Support of Defendants' Motion to Dismiss the Complaint, dated Feb. 5, 2020 ("Def. Reply Mem.") (Dkt. 28)).

## DISCUSSION

## I.   RULE 12(b)(6) STANDARDS

A complaint may be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure where it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). In deciding a motion to dismiss, the Court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007); *accord Jaghory v. New York State Dep't of Ed.*, 131 F.3d 326, 329 (2d Cir. 1997). The issue is not whether the plaintiff will ultimately prevail, but whether his claim, as pleaded, is sufficient to afford him the opportunity to proceed on the evidence. *See Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998).

Thus, the court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Kopec v. Coughlin*, 922 F.2d 152, 155 (2d Cir. 1991) (citation omitted). At the same time, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss." *Achtman v. Kirby, McInerney, & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006) (citation omitted). To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 666), *cert. denied*, 131 S. Ct. 901 (2011).

Additionally, "[i]t is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted 'to raise the strongest arguments that they suggest.'" *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (collecting cases); *see also Hughes v. Rowe*, 449 U.S. 5, 9-10 (1980) (noting that a *pro se* party's pleadings must be liberally construed in his favor and are held to a less stringent standard than the pleadings drafted by lawyers); *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) ("Even after *Twombly* . . . we remain obligated to construe a *pro se* complaint liberally."); *Lerman v. Bd. of Educ.*, 232 F.3d 135, 139-40 (2d Cir. 2000) ("Since most *pro se* plaintiffs lack familiarity with the formalities of pleading requirements, [a court] must construe *pro se* complaints liberally, applying a more flexible standard to evaluate their sufficiency."). This is especially true in the context of civil rights complaints. *See Weinstein v. Albright*, 261 F.3d 127, 132 (2d Cir. 2001); *see also Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001) (noting that a court must be "mindful of the care exercised in this Circuit to avoid hastily dismissing complaints of civil rights violations").

## II.   DEFENDANTS' MOTION TO DISMISS

In their motion, Defendants challenge the viability of Plaintiff's Title VII claim by first briefly stating that Plaintiff cannot be considered to have been the City's "employee" for purposes of the statute, and by then arguing at greater length that the claim must be dismissed because Plaintiff failed to exhaust his administrative remedies prior to bringing suit, and because he has failed to plead that the hostile work environment he allegedly experienced was based on a protected characteristic (such as his national origin), rather than his mere speaking of Spanish. (Def Mem., at 3-5.) Turning to Plaintiff's Section 1983 claims, Defendants argue that the facts alleged by Plaintiff regarding Bishop's refusal to let him speak Spanish are insufficient to plead a

violation of his First Amendment rights, and that, absent an underlying violation, Plaintiff can have no viable First Amendment retaliation claim.  (*Id.*, at 5-10.)  They also argue that Bishop, in any event, is entitled to qualified immunity on any asserted First Amendment claim.  (*See id.*, at 16-18.)  Finally, Defendants contend that Plaintiff has not pleaded a sufficient basis for municipal liability under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), so as to be able to maintain his Section 1983 claim against the City.  (*Id.*, at 11-16.)[6] This Court will address these arguments, in turn.

A.   **Viability of Plaintiff's Title VII Claim**

1.   **Title VII Standards**

a.   **Exhaustion Requirement and Statutory Limitations Periods**

"It is well established that Title VII requires a plaintiff to exhaust administrative remedies before filing suit in federal court," *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 384 (2d Cir. 2015) (citing *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 126 (2d Cir. 2010); *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir. 2001)), and this requirement "applies to *pro se* and counseled plaintiffs alike," *id.* (citation omitted).  In order to maintain a suit under the statute, an aggrieved employee must first file an administrative charge, either with the EEOC within 180 days, or with a state or local agency[7] within 300 days, of the

---

[6] In their moving brief, Defendants also include an argument directed to the viability of Plaintiff's originally asserted claim against the DOC (*see id.*, at 10 (arguing that the DOC is "a non-suable municipal agency")), apparently overlooking the fact that any claims that Plaintiff had initially been attempting to assert against the DOC have already been dismissed by the Court (*see supra*, at n.2).

[7] By virtue of a work-sharing agreement between the EEOC and the New York City Commission on Human Rights ("NYC CHR"), "a filing with the NYC CHR constitutes a 'dual-filing' with the EEOC."  *Isaacson v. N.Y. Organ Donor Network*, No. 08cv9545 (RMB) (THK), 2009 WL 9119999, at *2 n.2 (S.D.N.Y. Dec. 30, 2009) (citation omitted).

alleged unlawful employment practice.  42 U.S.C. § 2000e-5(e)(1).  If the administrative

complaint is dismissed or otherwise fails to result in resolution, then the EEOC will notify the

complainant of his or her right to bring a civil action under Title VII.  *Id.* § 2000e-5(f)(1).  Such

an action must be brought within 90 days of the complainant's receipt of a right-to-sue notice

from the EEOC.  *See id.*; *see also, e.g.*, *Sherlock v. Montefiore Med. Ctr.*, 84 F.3d 522, 525

(2d Cir. 1996) (citing statute).

Exhaustion, however, is not a jurisdictional requirement.  *Id.*  Rather, the failure to

exhaust is an affirmative defense, and thus "the burden of pleading and proving Title VII

exhaustion lies with defendants," *Hardaway v. Hartford Pub. Works Dep't*, 879 F.3d 486, 491

(2d Cir. 2018); *see also Burton v. Am. Fed. of Gov't Emps. (AFGE) 1988*, No. 11v1416 (SLT)

(LB), 2012 WL 3580399, at *7 (E.D.N.Y. Aug. 17, 2012) (noting that "a plaintiff is not required

to plead or demonstrate administrative exhaustion at the pleading stage").  Even so, an

affirmative defense of a failure to exhaust can be raised on a Rule 12(b)(6) motion, where

non-exhaustion is clear from the face of the plaintiff's complaint, or from documents attached

thereto or incorporated therein.  *See Jordan v. Forfeiture Support Assocs.*, 928 F. Supp. 2d 588,

594 n.5 (E.D.N.Y. 2013).  In the Title VII context, a court may also take judicial notice of

"public records and reports of relevant administrative bodies, as well as the facts set forth

therein," in order to determine whether a complaint should be dismissed for lack of exhaustion.

*Holmes v. Fresh Direc*t, No. 13cv4657 (NGG) (CLP), 2015 WL 4885216, at *4 (E.D.N.Y.

Aug. 5, 2015).

### b.   <u>Substantive Pleading Requirements</u>

Title VII forbids employment discrimination on the basis of "race, color, religion, sex, or

national origin."  42 U.S.C. § 2000e-2(a).  A plaintiff plausibly alleges a *prima facie* case of

disparate treatment if he or she proffers allegations that he or she:  (1) belongs to a protected

class; (2) was qualified for his or her position; and (3) suffered from an adverse employment

action; together with (4) allegations showing at least "minimal support for the proposition that

the employer was motivated by discriminatory intent."  *Littlejohn v. City of New York*, 795 F.3d

297, 311 (2d Cir. 2015); *see also Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83

(2d Cir. 2015) ("to defeat a motion to dismiss . . . in a Title VII discrimination case, a plaintiff

must plausibly allege that (1) the employer took adverse action against him, and (2) his race,

color, religion, sex, or national origin was a motivating factor in the employment decision").  An

"adverse employment action" is defined as "a materially adverse change in the terms and

conditions of employment."  *Schiano v. Quality Payroll Sys., Inc*., 445 F.3d 597, 609 (2d Cir.

2006) (internal quotations and citations omitted); *see also Galabya v. New York City Bd. of

Educ*., 202 F.3d 636, 640 (2d Cir. 2000).  "Examples of materially adverse changes include

termination of employment, a demotion evidenced by a decrease in wage or salary, a less

distinguished title, a material loss of benefits, significantly diminished material responsibilities,

or other indices unique to a particular situation."  *Schiano*, 445 F.3d at 609 (internal quotations

and citations omitted).

A plaintiff may also base a Title VII claim on allegations that he or she was subjected to a

hostile work environment.  For this type of claim to survive a Rule 12(b)(6) challenge, the

plaintiff must plausibly allege that the employer required him or her "to work in a

discriminatorily hostile or abusive environment."  *Littlejohn,* 795 F.3d at 320.  Courts have

explained that a hostile work environment is one that is both "objectively" severe and pervasive

(such that a reasonable person would find it hostile or abusive), and "subjectively" perceived as

such, by the plaintiff.  *See, e.g*., *Bell v. McRoberts Protective Agency, Inc*., No. 15cv963 (JPO),

2016 WL 7192083, at *4 (S.D.N.Y. Dec. 12, 2016).  Further, the hostile environment must have been created by the defendant "because" of the plaintiff's race, color, religion, sex, or national origin.  *Id.*

> **2.    As Plaintiff Cannot Be Considered To Have Had
> the Status of an "Employee" For Purposes of Title VII,
> His Title VII Claim Should Be Dismissed With Prejudice.**

As a threshold matter, a plaintiff suing under Title VII must plead facts sufficient to suggest that his or her claim against the defendant arose from an employment relationship.  As noted by the Second Circuit, "Title VII is an employment law, available only to employees (or prospective employees) seeking redress for the unlawful employment practices of their employers."  *Kern v. City of Rochester*, 93 F.3d 38, 45 (2d Cir. 1996) (citation omitted).  "Consequently, the existence of an employer-employee relationship is a primary element of Title VII claims."  *Gulino v. New York State Educ. Dep't*, 460 F.3d 361, 370 (2d Cir. 2006).

For the most part, Defendants appear to concede that at least some case law would support the conclusion that, for Title VII purposes, Plaintiff was "employed" by the City[8] at the MDC, and they therefore largely operate on that assumption, challenging Plaintiff's Title VII claim primarily on the grounds that Plaintiff has not pleaded exhaustion of the claim and has failed to allege facts sufficient to show that he was subjected to unlawful discrimination.  (*See generally* Def. Mem., at 3-5 (focusing on these arguments); Def. Reply Mem., at 2-3 (citing *Reyes v. McKee*, No. 1:11-cv-1283, 2012 U.S. Dist. LEXIS 28500, at *11-13 (W.D. Mich. Mar. 5, 2012) for the proposition that "relevant case law has analyzed factual allegations similar

---

[8] "Individuals are not subject to liability under Title VII."  *Stanley v. Guardian Sec. Servs., Inc.,* 800 F. Supp. 2d 550, 555 (S.D.N.Y. 2011) (internal alteration omitted) (citing *Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir. 2000) (per curiam)).  Thus, Plaintiff cannot bring a Title VII claim against Bishop, and this Court will analyze Plaintiff's claim as against the City only.

to those in [P]laintiff's [C]omplaint – prisoners bringing suit over their work assignments – by assuming that prisoners were 'employees'".)  Nonetheless, even though they raise the issue in only a cursory manner, Defendants do state, in leading off the section of their moving brief that is directed to Plaintiff's Title VII claim, that "[P]laintiff has not pleaded sufficient facts to establish that he was a DOC 'employee' under 42 U.S.C. § 2000e(f), and thus entitled to file an action under [Title VII]."  (Def. Mem., at 3.)  Moreover, in response – while still trying to maintain his Title VII claim – Plaintiff seems to concede this point, as he states that he "never alleges being an 'employee.'"  (Pl. Opp., at ECF 2.)  Accordingly – and because, if Plaintiff may not be considered an "employee" for Title VII purposes, this would necessarily dispose of his claim – this Court will reach the issue.

Those Circuits that have considered the question of whether inmates or detainees are excluded, as a matter of law, from Title VII's definition of "employee" have been split on the issue.  *Compare Baker v. McNeil Island Corrections Center,* 859 F.2d 124, 125 (9th Cir. 1988) (overruling dismissal of prisoner's Title VII claim), *with Wilkerson v. Samuels*, 524 Fed. App'x 776, 779 (3d Cir. 2013); *Williams v. Meese*, 926 F.2d 994, 997 (10th Cir. 1991) (affirming dismissal of prisoner's Title VII claim); *see also Overholt v. Unibase Data Entry, Inc.*, 221 F.3d 1335 (Table) (6th Cir. 2000) ("It is unclear whether prisoners are protected under Title VII."); *Bryant v. Madigan*, 84 F.3d 246, 248 (7th Cir. 1996) (noting the conflicting circuit authority regarding whether prisoners employed in the prison may be protected by Title VII).  Although the question has not been squarely addressed by the Second Circuit, its reasoning in an analogous case suggests that it would likely side with those Circuits that have found the necessary employment relationship to be lacking.

In particular, the Second Circuit has rejected the proposition that inmates participating in prison work programs may be considered "employees" for purposes of the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.* (the "FLSA").  In that context, the court applied the "economic reality" test[9] to ascertain the relationship of the parties, and concluded that prison labor that "produces goods or services for institutional needs of the prison, whether voluntary or involuntary, inside or outside the institution, or in connection with a private employer, is not an employment relationship within the meaning of the FLSA." *Danneskjold v. Hausrath*, 82 F.3d 37, 43-44 (2d Cir. 1996) (holding inmate's work as a tutor to other student inmates did not qualify him to receive minimum wage under the FLSA because he was not an "employee" within the meaning of that statute).  As a general matter, the court reasoned that "the voluntary performance of labor that serves institutional needs of the prison is not in economic reality an employment relationship." *Id., at* 43-44; *see also Kavazanjian v. Naples*, No. 06-CV-3390 (JG), 2006 WL 2795220, at *2 (E.D.N.Y. Sept. 26, 2006) (applying *Danneskjold* to hold that the FLSA does not apply to inmates assigned to work for the Department of Motor Vehicles, because the labor served "another state agency not engaged in commerce" and "the institutional needs of the prison").

Like Title VII, the FLSA defines "employee" as "any individual employed by an employer." *Compare* 29 U.S.C. § 203(e)(1) *with* 42 U.S.C. § 2000e(f) (defining "employee" as

---

[9] The "economic reality" test sets forth four non-exclusive factors for courts to consider in determining whether an employee-employer relationship exists, specifically whether, *inter alia,* the alleged employer "(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Irizarry v. Catsimatidis,* 722 F.3d 99, 109 (2d Cir. 2013) (quoting *Carter v. Dutchess Cmty. Coll.,* 735 F.2d 8, 12 (2d Cir. 1984), *holding modified by Danneskjold v. Hausrath,* 82 F.3d 37 (2d Cir. 1996), *and holding modified by Zheng v. Liberty Apparel Co. Inc.,* 355 F.3d 61 (2d Cir. 2003)).

"an individual employed by an employer").  Although, for Title VII cases, the Second Circuit has

typically applied the so-called "agency" test in determining whether an employment relationship

exists,[10] rather than the "economic reality" test that the court applied in *Danneskiold*, *see Knight*,

880 F.3d at 641, it is also true that the agency test "is not well suited to determining the status of

[prison] labor" and "has little relevance to the unique status of a prisoner and his or her

relationship to the correctional institution," *Danneskjold*, 82 F.3d at 40-43.  On this point, the

Second Circuit observed that prisoners "are not generally participants in the national economy,"

that they "have limited rights, and [that] their conduct is closely regulated."  *Id.* at 43.

Notably, the Supreme Court has found that the FLSA "defines the verb 'employ'

expansively" and "stretches the meaning of 'employee' to cover some parties who might not

qualify as such under a strict application of traditional agency law principles."  *Nationwide Mut.*

*Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992).  It follows from this that, if the Second Circuit has

concluded that prisoners who provide labor in the form of "services for the use of the prison,"

*Danneskjold*, 82 F.3d at 43, are not "employees" even under the FLSA's expansive definition,

---

[10] In analyzing employment relationships under the agency test, courts consider "a non-exhaustive list of thirteen factors," including:

> the hiring party's right to control the manner and means by which
> the product is accomplished[;] ... the skill required; the source of
> the instrumentalities and tools; the location of the work; the
> duration of the relationship between the parties; whether the hiring
> party has the right to assign additional projects to the hired party;
> the extent of the hired party's discretion over when and how long
> to work; the method of payment; the hired party's role in hiring
> and paying assistants; whether the work is part of the regular
> business of the hiring party; whether the hiring party is in business;
> the provision of employee benefits; and the tax treatment of the
> hired party.

*Knight v. State Univ. of New York at Stony Brook*, 880 F.3d 636, 641 (2d Cir. 2018) (citing *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 751-52 (1989).

then the court would not likely consider such individuals to be "employees" under the narrower "agency" test, or for purposes of Title VII.

Furthermore, although the Second Circuit has not directly concluded that the protections of Title VII do not extend to prisoners, at least one district court within this Circuit has reached that conclusion, after surveying the existing case law on the issue.  *See West v. Goord*, No. 05cv447 (FPG), 2017 WL 3251253, at *16 (W.D.N.Y. July 31, 2017) (finding that "[f]ederal courts . . . have repeatedly held that that Title VII, an employment discrimination statute, does not apply to inmates who are assigned to prison jobs" (collecting cases)).  In addition, federal agency guidance suggests that Title VII should not be construed to cover prison workers. Indeed, the EEOC has stated, more than once, that prison inmates who are "required to work by or who does work for the prison . . . is not an employee within the meaning of [Title VII]." EEOC Decision No. 86-7, 40 Fair Empl. Prac. Cas. 1892 (1986); *see also* EEOC Informal Discussion Letter, Empl. Prac. Guide ¶ 5453, 2016 WL 3360229 (Mar. 26, 2016) ("If the work, or lack of work, is based on incarceration, it is not covered by Title VII or other employment discrimination laws." (citing *Williams,* 926 F.2d at 997)).

Overall, even apart from Plaintiff's seeming concession that he was not an "employee" for purposes of Title VII, this Court concludes that the weight of authority, combined with the reasoning of the Second Circuit in the analogous FLSA context, compels the conclusion that Plaintiff may not, as a matter of law, be considered to have been an "employee" for purposes of Title VII, and that his Title VII claims should therefore be dismissed with prejudice.

**3.**     **Should the Court Determine That Plaintiff May Be
Considered an "Employee" for Title VII Purposes,
Then His Title VII Claim Should, in Any Event,
Be Dismissed as Deficient, But With Leave To Amend.**

Given that – in light of the Circuit split and lack of any direct ruling by the Second

Circuit on the point – there is some uncertainty in the law as to whether Plaintiff may be

considered to have been in an "employment" relationship with the City for purposes of Title VII,

this Court will go on to consider the other arguments that Defendants have raised for dismissal of

Plaintiff's Title VII claim.  While Defendant's principal argument (that Plaintiff has failed to

plead exhaustion of his administrative remedies) is not persuasive, Defendants' additional

argument (that Plaintiff cannot maintain a Title VII claim without factual allegations tending to

support that he was discriminated against because of his membership in a protected class) has

more force.  If the claim were to be dismissed on this basis, though, Plaintiff should be given

leave to amend to plead the facts that are missing from his current Complaint.

**a.**     **Defendants' Argument Regarding
Lack of Exhaustion Is Misplaced.**

The main argument that Defendant advances as to why Plaintiff's Title VII claim should

be dismissed is that he has failed to plead that he exhausted his remedies with the EEOC prior to

bringing the present suit.  This argument is contrary to well-established law.  As set out above,

exhaustion is not a jurisdictional requirement, *Fowlkes*, 790 F.3d at 384; rather, the failure to

exhaust is an affirmative defense, *Burton*, 2012 WL 3580399, at \*7, that will be Defendants'

burden to establish, *Hardaway*, 879 F.3d at 491.  The position that Defendants seek to assert

here – that Plaintiff was required to allege exhaustion – has been held to be a position that

"would effectively subvert the Second Circuit's mandate that [exhaustion] is an affirmative

defense."  *Frederic v. NFC Amenity Mgmt.*, No. 17cv5769 (AJN), 2018 WL 4735715, at \*3

(S.D.N.Y. Sept. 28, 2018) (reasoning that dismissing *pro se* plaintiff's claim for failure to allege that she exhausted her administrative remedies would incorrectly switch the burden from defendant to plaintiff).

Although, as set out above, the affirmative defense of lack of exhaustion may be appropriately raised on a Rule 12(b)(6) motion where the plaintiff's pleading, on its face (or documents attached thereto, incorporated by reference therein, or subject to judicial notice) demonstrate a lack of exhaustion, *see Hardaway*, 879 F.3d at 491; *Jordan*, 928 F. Supp. 2d at 594 n.5; *Holmes*, 2015 WL 4885216, at *4, no such circumstance is presented here.  In this case, Plaintiff has not affirmatively pleaded that he did *not* exhaust his administrative remedies, and Defendants have pointed to no documents that the Court should consider at this stage that would warrant dismissal on the grounds of lack of exhaustion.

Accordingly, to the extent Defendants have moved for dismissal of Plaintiff's Title VII claim because of his purported lack of administrative exhaustion, their motion should be denied.

**b.      Defendants Are Correct That Plaintiff Has
Not Adequately Pleaded Discrimination
<u>Based on Membership in a Protected Class.</u>**

Defendants are correct, however, that – even if Plaintiff were considered an "employee" – his Title VII claim could not otherwise survive on the merits, as currently pleaded, as he has failed to allege that he experienced a hostile work environment on the basis of his membership in any protected class.  While Title VII protects employees from discrimination on the basis of, *inter alia*, race and national origin, *see* 42 U.S.C. § 2000e-2(a), which includes ethnicity, *see Vill. of Freeport v. Barrella,* 814 F.3d 594, 607-08 (2d Cir. 2016) ("discrimination based on ethnicity, including Hispanicity or lack thereof, constitutes racial discrimination under Title VII" and "may *also* be cognizable under the rubric of national-origin discrimination"

(emphasis in original)), the statute does not extend protection, *per se*, to speakers of non-English languages, *see Pacheco v. New York Presbyterian Hosp.,* 593 F. Supp. 2d 599, 612 (S.D.N.Y. 2009) (collecting cases); *Brewster v. City of Poughkeepsie*, 447 F. Supp. 2d 342, 351 (S.D.N.Y. 2006).

"In some circumstances," however, "a prohibition on speaking one's native language in the workplace can be an indication of unlawful race or national origin discrimination." *Ruiz v. City of New York,* No. 14cv5231 (VEC), 2015 WL 5146629, at *4 n.3 (S.D.N.Y. Sept. 2, 2015) (citing *Pacheco*).  Ultimately, unsupported allegations that Bishop discriminated against Plaintiff based on his race, national origin, or ethnicity would not be enough to enable him to meet his burden of proving such discrimination, *see Castro v. Local 1199,* 964 F. Supp. 719, 727 (S.D.N.Y. 1997) (at summary judgment stage, Plaintiff's "conclusory allegation" that supervisor "manifested an obvious dislike of Hispanics" when instructing Plaintiff to speak English was "a conclusory allegation of discrimination"), but, at the pleading stage, Plaintiff would not need to come forward with actual evidence of the necessary animus.  He would merely need to allege facts from which a plausible inference could be drawn that the City discriminated against him or subjected him to a hostile work environment because of his race, national origin, or ethnicity.

At this point, Plaintiff has alleged no facts, aside from Bishop's insistence that he and other inmates refrain from speaking Spanish, that would indicate that the City subjected him to severe and pervasive hostile work environment on the basis of his membership in any class protected by Title VII, but it is possible that he would be able to do so, if given an opportunity to amend.  For that matter, although he has currently framed his Title VII claim in terms of a "hostile work environment," Plaintiff might also be able to allege facts from which it could plausibly be inferred that the City terminated him from his job in the kitchen – *i.e.*, caused him to

17

suffer an "adverse employment action" – based, at least in part, on his supervisor's known animus towards his race, national origin, or ethnicity.  *See Vega*, 801 F.3d at 86.

Under Rule 15 of the Federal Rules of Civil Procedure, a district court should "freely give leave to amend when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Further, where there is any possibility that an amendment would cure pleading deficiencies, a court, as a general matter, should not dismiss claims asserted by a *pro se* plaintiff for failure to state a claim without granting at least one opportunity for the plaintiff to amend the complaint.  *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (holding that district courts "should not dismiss [a *pro se* complaint] without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." (quoting *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999))).  Accordingly, should the Court find that the "employment" requirement of Title VII does not bar Plaintiff's Title VII claim as a matter of law, then I would recommend that his Title VII claim against the City be dismissed with leave to amend his Complaint.

Upon such a ruling, I would further recommend that Plaintiff be directed that any amendment to his hostile-work-environment claim, as well as any assertion of a disparate-treatment claim based on his termination, should include factual allegations from which it could reasonably be inferred that the alleged discriminatory conduct was motivated, at least in part, by animus towards his race, national origin, or ethnicity.  In addition, with respect to his hostile-work-environment claim, Plaintiff should be instructed to include any factual allegations that could support an inference that, because of his race, national origin, or ethnicity, he was subjected to abuse at his job that was not only perceived by him as abusive, but that was objectively severe and pervasive.  *See Bell*, 2016 WL 7192083, at *4.

**B.**     <u>**Sufficiency of Plaintiff's Section 1983 Claims**</u>

Plaintiff's Complaint sets forth two distinct claims under Section 1983:  first, that his constitutional rights were violated when Bishop ordered him not to speak Spanish in the kitchen (*see* Compl., at ECF 23, 25, 27); and second, that he was retaliated against for exercising his First Amendment right to file a grievance against Bishop (*see id.*).  As a general matter, throughout the Complaint, Plaintiff appears to assert the first claim only against Bishop, and the second only against the City.  (*See generally* Compl.)  Liberally construing the Complaint, however, and interpreting Plaintiff's allegations as a whole to raise the strongest arguments they suggest, it appears at least possible that Plaintiff is attempting to assert both claims against both Defendants.  (*Id.* at ECF 27 (referencing Bishop's "retaliatory actions" and claiming "First Amendment Constitutional rights violations" by the City).)  This Court will therefore examine Plaintiff's claims as if they were each asserted against both Defendants.[11]

**1.**     <u>**Section 1983 Standards**</u>

Section 1983 "provides a private right of action against any person who, acting under color of state law, causes another person to be subjected to the deprivation of rights under the Constitution or federal law."  *Gonzalez v. City of New York*, 377 F. Supp. 3d 273, 285 (S.D.N.Y. 2019); *see also* 42 U.S.C. § 1983.  A claim under Section 1983 may be asserted against an individual state actor, or – with a sufficient factual predicate to satisfy the requirements set out in *Monell* – a municipality.

---

[11] This Court notes that Defendants also appeared to presume that each claim was asserted against both Defendants (*see, e.g.,* Def. Mem., at 8 (noting that, with regards to Plaintiff's claim of a First Amendment right to speak Spanish, "plaintiff has not identified any allegedly unconstitutional DOC policy"; *id.* at 10 (analyzing Plaintiff's retaliation claim as if asserted against Bishop)), and that Defendants should therefore be found to have had adequate an opportunity to brief all issues addressed herein.

In order for a Section 1983 claim asserted against an individual to survive a Rule 12(b)(6) motion to dismiss, the plaintiff "must [have] allege[d] facts showing the individual's direct and personal involvement in the alleged constitutional deprivation."  *Tripathy v. City of New York*, 2020 WL 3578198, at *4 (S.D.N.Y. June 30, 2020) (citing *Spavone v. N.Y. State Dep't of Corr. Serv.*, 719 F.3d 127, 135 (2d Cir. 2013)).  The plaintiff may be sound to have sufficiently pleaded the requisite "direct and personal involvement" of the individual defendant where the plaintiff has pleaded any of the following:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (4) the defendant exhibited deliberate indifference to the rights of [the plaintiff] by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)).  "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [Section] 1983."  *Marom v. City of New York,* No. 15cv2017 (PKC), 2016 WL 916424, at *14 (S.D.N.Y. Mar. 7, 2016)), *reconsideration granted, in part, on other grounds*, 2016 WL 5900217 (S.D.N.Y. July 29, 2016).

Under *Monell*, a municipality qualifies as a "person" under Section 1983, such that it may be subject to suit for violating another person's federal rights.  *Monell*, 438 U.S. at 690-91.  A municipality, however, may not be held liable under Section 1983 solely because one of its employees violated a plaintiff's rights.  *See id.*  Instead, for Section 1983 liability to attach, a plaintiff must ultimately prove "(1) the violation of a right, privilege, or immunity secured by the

Constitution or laws of the United States (2) by a person *acting under the color of state law.*"  *Farrell v. City of New York*, No. 15cv8401 (PAE), 2018 WL 944400, at *4 (S.D.N.Y. Feb. 15, 2018) (emphasis added) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)).  A municipality may be said to be "acting under the color of state law" only if the challenged conduct of its employee(s) is based on an official municipal policy, custom, or practice.  *Monell,* 438 U.S. at 691-92; *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 403 (1997) ("in *Monell* and subsequent cases, we have required a plaintiff . . . to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury").

At the pleading stage, a plaintiff seeking to hold a municipality liable under Section 1983 "must allege facts tending to support, at least circumstantially, an inference that [an alleged] municipal policy or custom exists."  *Matthews v. City of New York*, No. 15cv2311 (ALC), 2016 WL 5793414, at *9 (S.D.N.Y. Sept. 30, 2016) (citations and internal quotation marks omitted); *see Santos v. New York City,* 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012).  To allege the plausible existence of an unconstitutional policy or custom, the plaintiff must allege either:

> (1) a formal policy which is officially endorsed by the municipality; (2) actions taken or decisions made by government officials responsible for establishing municipal policies which caused the alleged violation of the plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a 'custom or usage' and implies the constructive knowledge of policy-making officials; or (4) a failure by official policy-makers to properly train or supervise subordinates to such an extent that it 'amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact.'

*Berg v. Kelly,* 343 F. Supp. 3d 419, 425 n.2 (S.D.N.Y. 2018) (citations omitted).

"[A] single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy."  *Johnson v. City of New York,* No. 06cv9426 (GBD), 2011 WL 666161 (S.D.N.Y. Feb. 15, 2011) (citing *DeCarlo v.*

*Fry,* 141 F.3d 56, 61 (2d Cir. 1998)).  Furthermore, a plaintiff must plead facts sufficient to raise

a plausible inference that the policy, custom, or practice was the cause of plaintiff's alleged

injury.  *Berry v. Village of Millbrook,* 815 F. Supp. 2d 711, 717 (S.D.N.Y. 2011) (plaintiff's

allegations in support of a *Monell* claim must raise a plausible inference that, "through its

deliberate conduct, the municipality was the 'moving force' behind the alleged injury"

(citing *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008))).

Here, this Court will first consider whether Plaintiff has adequately stated his

Section 1983 claims against Bishop, and then consider the question of the City's potential

liability.

### 2.   Plaintiff's Claims Against Bishop

#### a.   Plaintiff's Claim That Bishop Violated His First Amendment Rights by Prohibiting Him From Speaking in Spanish

As set forth below, this Court finds that, through his allegations that Bishop ordered him

not to speak in Spanish, Plaintiff has stated a plausible claim for violation of a First Amendment

right.  Since that right is not clearly established, however, this Court is constrained to

recommend that this claim be dismissed with prejudice, on the grounds that Bishop is entitled to

qualified immunity.

##### i.   The Complaint States a Plausible Claim That Bishop Infringed Plaintiff's Right To Free Speech.

As a preliminary matter, the Court notes that, while Defendants state, in their moving

brief, that "in the prison context, there is no general constitutional right to speak a foreign

language" (Def. Mem., at 5), the main thrust of Defendants' argument is that, applying the

multi-factor test set forth by the Supreme Court in *Turner v. Safley,* 482 U.S. 78, 89 (1987),[12] Bishop should be found to have had a "legitimate penological interest" in directing Plaintiff not to speak Spanish, in light of considerations regarding prison security and officer safety where Plaintiff spoke a language that Bishop purportedly could not understand (*see* Def. Mem., at 5-6 (citing *Turner*)).  Thus, it appears that Defendants are prepared to assume that Plaintiff *did* have a constitutional right to speak a foreign language in the facility, but that, in the specific circumstances presented, Bishop was justified in impinging on that right.

On the underlying question of whether inmates or detainees should be recognizing as having the general right to speak in their native language, while in prison or detention, this Court has found no Supreme Court or Second Circuit authority that is directly on point.  In an arguably analogous context, though, at least two Circuits have held that a blanket restriction on prisoners' sending and receiving of correspondence or publications in languages other than English is constitutionally impermissible, suggesting that, in fact, inmates may possess and retain a right to communicate in languages other than English and that restrictions on such communications must therefore satisfy the factors set forth in *Turner.  See Kikumura v. Turner*, 28 F.3d 592, 598 (7th Cir. 1994) (finding prohibition on prisoner's receipt of all foreign language publications to be unconstitutional);[13] *Thongvanh v. Thalacker*, 17 F.3d 256, 258 (8th Cir. 1994) (applying *Turner*

---

[12] The Supreme Court held, in *Turner*, that "a prison regulation [that] impinges on inmates' constitutional rights . . . is valid if it is reasonably related to legitimate penological interests."  *Id.* at 89.  In analyzing whether a regulation is valid under this standard, the Supreme Court has directed courts to analyze (1) whether there is a "valid, rational connection" between the regulation and the legitimate government interest; (2) "whether there are alternative means of exercising the right that remain open"; (3) the impact accommodating the right will have on guards and other inmates; and (4) "the absence of ready alternatives" to the regulation.  *Id.* at 89-90.

[13] *Cf. Boriboune v. Litscher*, 91 F. App'x 498, 500 (7th Cir. 2003) (in case involving plaintiff's challenge to prison policy of preventing him, absent permission from a social worker, from having telephone calls in his native language with those outside the prison, finding no

analysis to prison policy that forbid plaintiff from corresponding in his native language); *cf.*

*Yniguez v. Arizonans for Official English,* 69 F.3d 920, 949 (9th Cir. 1995) (finding that a

blanket ban on government employees speaking languages other than English in the performance

of their duties violated the First Amendment), *vacated sub nom. Arizonans for Official English v.*

*Arizona,* 520 U.S. 43 (1997) (vacating opinion of the Ninth Circuit on the grounds that plaintiff

lacked standing).  In addition, as is evident from the case law cited by Defendant and discussed

below, district courts, including at least one from within this Circuit, have implicitly accepted the

underlying premise that a refusal to allow a prisoner to speak a foreign language within a

facility – including while working in that facility – may be violative of the First Amendment,

unless the *Turner* factors are satisfied.  *See Allah v. Poole,* 506 F. Supp. 2d 174 (W.D.N.Y. 2007)

(cited in Def. Mem. at 6-8); *Reyes v. McKee,* No. 1:11-CV-1283, 2012 WL 718952, at *1 (W.D.

Mich. Mar. 5, 2012) (same).  Without definitively deciding the question, this Court will therefore

similarly assume that Plaintiff had the right to speak Spanish to others within the environment of

the MDC, absent a legitimate penological interest justifying the restriction of that right.

As to Defendants' argument that Plaintiff's First Amendment claim should be dismissed

pursuant to *Turner,* Defendants principally rely on the *Allah* and *Reyes* cases.  In *Allah,* after the

parties completed discovery, the defendants moved for summary judgment on a claim by the

plaintiff, a commissary worker, that an officer's directive to him not to speak Spanish while at

work violated his First Amendment rights.  *See Allah,* 506 F. Supp. 2d at 181.  The district court

applied the *Turner* factors, and found that the directive not to speak Spanish was reasonably

---

constitutional violation, and distinguishing *Kikumura* on the grounds that *Kikumura* was
"'narrowly limited' to the situation in which 'a prison makes no effort at all to accommodate the
constitutional rights of prisoners native in languages other than English'" (citing *Kikumura,* 28
F.3d at 598)).

related to a legitimate penological interest, specifically because (1) the plaintiff could still communicate in English with his co-workers; (2) the plaintiff could speak Spanish when he was not working; and (3) the plaintiff had failed to demonstrate any genuine dispute of fact that providing interpreters or Spanish-speaking guards would create more than a *de minimis* burden on the prison.  *Id.*, at 183-84.

Similarly, in *Reyes,* the plaintiffs alleged that they had been berated by a corrections officer for, and ultimately barred from, speaking Spanish while at work in the prison's kitchen. *Reyes,* 2012 WL 718952, at *1.  Relying on *Allah,* the district court dismissed the complaint for failure to state a claim, finding that, because the corrections officer did not speak Spanish, his "legitimate penological interest was patently obvious" and the order not to speak Spanish was "rationally related to that interest."  *Id.*, at *6.  Specifically, the Court noted that, although Plaintiff "could be accommodated by at all times ensuring that Spanish-speaking prison employees were present in the kitchen," *id.*, the burden on the prison to supply that accommodation would not be *de minimis,* and thus the *Turner* factors did not weigh in plaintiffs' favor, *id.*

Defendants' reliance on these cases is misplaced, as Defendants overlook that it is their own burden, not Plaintiff's, to articulate a legitimate penological interest in the first instance. *Salahuddin v. Goord,* 467 F.3d 263, 276 (2d Cir. 2006) ("Under [] *Turner* . . ., once a prisoner shows that a prison regulation impinges on a protected right, *prison officials* must show that the disputed official conduct was motivated by a legitimate penological interest" (emphasis added)); *Hall v. Ekpe,* 408 F. App'x 385, 388 (2d Cir. 2010) (summary order) (once plaintiff has articulated a burden on a First Amendment right, "[t]he defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging

conduct" (citing *Salahuddin*)); *accord Lopez v. Cipolini,* 136 F. Supp. 3d 570, 587 (S.D.N.Y. 2015) (citation omitted).

Consistent with this principle, *Allah* was decided at the summary-judgment stage, where the parties had the benefit of a discovery record regarding the officer's reasons for the directive not to speak Spanish, and regarding the relative benefits and burdens to plaintiff and the prison in accommodating Plaintiff's non-English communications.  *See Allah,* 506 F. Supp. 2d, at 183-84 (noting, *inter alia,* that "the stated rationale for [the officer's] order [was] to ensure her own safety," that "the officer was alone in the commissary," that "plaintiff could still communicate in English with his co-workers," and that "the restriction on his use of Spanish applied only while [plaintiff] was working in the commissary, and that he was generally free to communicate in Spanish elsewhere").  To the extent the court, in *Reyes*, dismissed the plaintiffs' claim at the motion-to-dismiss stage, without there having been discovery as to the relevant *Turner* factors, and relying on the court's opinion on summary judgment in *Allah,* this Court does not believe that *Reyes* was correctly decided.  *See Washington v. Gonyea,* 538 F. App'x 23, 27 (2d Cir. 2013) (summary order) (noting that "assessing the reasonableness of penological interests is a factual and context-specific inquiry that in this case is inappropriate at [the motion-to-dismiss] stage"); *Lloyd v. City of New York,* 43 F. Supp. 3d 254, 264 (S.D.N.Y. 2014) (denying motion to dismiss First Amendment claim in part because "[t]his being a motion to dismiss, [d]efendants have not answered, and so have not yet articulated any "legitimate penological interest" or "compelling state interest" that would justify the alleged [First Amendment violation]"); *see also Hosannah v. Nassau Cty. Criminal Supreme Court Sergeant Officer(s),* No. 16cv1045 (JFB) (AYS), 2017 WL 3207966, at *13 (E.D.N.Y. July 5, 2017) ("At this stage of the litigation, where [d]efendant has challenged, under Rule 12(b)(6), Plaintiff's pleading of his [First Amendment]

claims, the Court need not address the question of . . . whether the [d]efendant may be able to make an adequate showing of a 'legitimate penological interest'"), *report and recommendation adopted sub nom. Hosannah v. Sposato,* 2017 WL 3207750 (E.D.N.Y. July 26, 2017).

Moreover, in this case, neither the Complaint nor any evidence submitted by Defendants (assuming the Court could consider such evidence), supports what is now nothing more than a speculative suggestion that Bishop was not able to understand what Plaintiff was saying in Spanish.  (*See* Def. Mem., at 7 (arguing that "[a] conversation between an inmate and a C.O. in Spanish raise the same penological interests [as were raised in *Allah*] – C.O. Bishop would need to hear and understand such a conversation so as to be aware whether or not [P]laintiff's words were threatening or were otherwise improper"); Def. Reply Mem., at 5 (arguing that "the courts have directly found that the dangers inherent in working in a prison kitchen – the specific situation presented in this case – mean that there is a penological interest in not allowing inmate employees in that kitchen to speak a language that a C.O. could not understand" (citing *Reyes*)).) Even apart from the fact that it is generally inappropriate, on a Rule 12(b)(6) motion, for a court to consider facts outside the plaintiff's pleading, *see, e.g.*, *Braun v. United Recovery Sys., LP,* 14 F. Supp. 3d 159, 170 (S.D.N.Y. 2014) (at the 12(b)(6) stage, declining to consider facts proffered by Defendant that were neither contained in the Complaint nor subject to judicial notice), it is surely true that statements made or implied only in a defendant's legal brief cannot provide a factual predicate for the dismissal of a claim.[14]

---

[14] In his opposition brief, Plaintiff expresses his own belief that Bishop could not understand Spanish and therefore felt threatened by those who spoke Spanish – including those who were not themselves inmates or detainees.  (*See* Pl. Opp., at ECF 2 (Plaintiff stating that he "was discriminated against by corrections officer Bishop not because of speaking [S]panish but because officer Bishop couldn't understand [S]panish . . ." and that "C.O. Bishop never made any log entries or brought it to the attention of any of her supervis[o]rs that she felt threaten[e]d by the speaking of [S]panish by the inmates/detainees and by the civilian staff because she didn't

In addition, the facts that are alleged in the Complaint demonstrate some key distinguishing points from *Allah* and *Reyes*.  First, where the officer in *Allah* (and perhaps in *Reyes*, as well, although this is unclear) was reportedly alone with inmates, *see Allah*, 506 F. Supp. 2d at 178; *Reyes*, 2012 WL 718952, at *4, Plaintiff, here, alleges that Bishop was accompanied by other officers, including those who could allegedly speak Spanish, perhaps mitigating certain security concerns.  (Compl., at ECF 23; *see also* Pl. Opp., at ECF 23 (distinguishing *Allah*).)  Second, where the inmates in *Allah* and *Reyes* claimed to have spoken Spanish to other inmates, *see Allah*, 506 F. Supp. 2d at 178; *Reyes*, 2012 WL 718952, at *4, Plaintiff here alleges that he was reprimanded for speaking Spanish to a Spanish-speaking *officer*.  (Compl., at ECF 23.)  Third, where the courts in *Allah* and *Reyes* concluded that the accommodation of having Spanish-speaking officers in the kitchen would not be a "*de minimis*" burden, *see Allah*, 506 F. Supp. 2d at 184; *Reyes*, 2012 WL 718952, at *6, Plaintiff alleges that he routinely spoke Spanish to officers in the kitchen, suggesting that perhaps there were sufficient number of Spanish-speaking officers to ensure that one was present in the kitchen

---

understand [S]panish").)  This Court acknowledges that there are times when it may be appropriate on a motion to dismiss a *pro se* complaint to consider factual allegations made by the plaintiff in his opposition to the motion.  *See, e.g.*, *Samuels v. Fischer*, 168 F. Supp. 3d 625, 645 n.11 (S.D.N.Y. 2016).  Generally, though, the purpose of considering allegations made by a *pro se* plaintiff outside the pleadings is to ensure that his complaint is afforded its most favorable construction, prior to dismissal.  *See Rodriguez v. McGinnis*, 1 F. Supp. 2d 244, 246-47 (S.D.N.Y. 1998) (citing "policy reasons favoring liberal construction"); *see also Johnson v. Wright*, 234 F. Supp. 2d 352, 356 (S.D.N.Y. 2002) (noting that "[e]xamining such materials is consistent with the principle that a court may not dismiss a *pro se* complaint unless it is beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief (internal quotation marks and citations omitted)).  Here, accepting as true Plaintiff's statements in his opposition brief regarding Bishop's lack of understanding of Spanish, and using that as a basis for dismissal, would be inappropriate, both because it would not serve the aim of reading Plaintiff's Complaint liberally in his favor, and also because, absent an explanation as to how Plaintiff has personal knowledge regarding what Bishop could or could not understand, much less how she felt upon hearing others speak Spanish, the statements in Plaintiff's opposition must be seen as just as speculative and conclusory as those in Defendants' briefs.

without imposing a significant burden.  (Compl., at ECF 23, 25.)[15]  Finally, although the court, in *Allah*, specifically noted that the plaintiff was able to communicate with his co-workers in English, *Allah,* 506 F. Supp. 2d at 183, here, Plaintiff has alleged that certain inmates in the kitchen spoke only in Spanish (*see* Compl., at ECF 25), suggesting that Bishop's directive imposed an even greater burden on him, generally, than the one imposed in *Allah.*  Each of these contrasts suggest that discovery, if allowed to proceed, could bear out a very different picture of the respective burdens on Plaintiff and the Facility, under the factors set forth in *Turner.*

In short, because Defendants have not shown that, on the face of the Complaint, the *Turner* factors weigh conclusively in their favor, their argument for dismissal of Plaintiff's First Amendment claim fails.  Nevertheless, for the reasons set forth below, this Court is constrained to recommend that Plaintiff's claim be dismissed with prejudice, on the grounds that Bishop is entitled to qualified immunity with respect to this claim.

> **ii.      Bishop Is Entitled To Qualified Immunity on Plaintiff's Claim That Prohibiting Him From <u>Speaking Spanish Was a Constitutional Violation.</u>**

Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The qualified immunity analysis consists of two steps:  "first, whether the plaintiff established that his constitutional rights were violated, and second, whether the right at issue was 'clearly

---

[15] As to Defendant's assertion that asking other officers to translate is "ludicrous," that the other officers had "a specific job to do," and "were not tasked with providing translation services" (Def. Reply Mem., at 5), those statements are merely conclusory, not buttressed by any facts in the Complaint, and miss the question of whether the officers could be asked to translate with only *de minimis* burden, or indeed whether translation would even be necessary.

established' at the time of the alleged violation." *Bacon v. Phelps*, 961 F.3d 533, 542 (2d Cir.

2020) (quoting *Pearson*, 555 U.S. at 232).  The district court has discretion to address these two

prongs in the order it deems appropriate.  *Jones v. City of New York*, No. 18cv1937 (VSB), 2020

WL 1644009, at *13 (S.D.N.Y. Apr. 2, 2020).

For a right to be clearly established, "a legal principle must have a sufficiently clear

foundation in then-existing precedent . . . [such] that every reasonable official would interpret it

to establish the particular rule the plaintiff seeks to apply."  *Jones*, 2020 WL 1644009 at *12

(quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 589-90 (2018)).  "Rights must be clearly

established in a 'particularized' sense, rather than at a high level of generality; and such rights

are only clearly established if a court can 'identify a case where an officer acting under similar

circumstances' was held to have acted unconstitutionally."  *Grice v. McVeigh,* 873 F.3d 162, 166

(2d Cir. 2017) (quoting *White v. Pauly,* 137 S. Ct 548 (2017)).  Although a plaintiff who contests

qualified immunity "is not required to find 'a case directly on point for a right to be clearly

established' . . . there must be some 'existing precedent [that has] placed the statutory or

constitutional question beyond debate.'"  *Wagschal v. Skoufis,* 442 F. Supp. 3d 612, 624

(S.D.N.Y. 2020) (quoting *White*).

Given that qualified immunity constitutes an affirmative defense, the defendant bears the

burden of showing that he or she is entitled to qualified immunity.  *Bacon*, 961 F.3d at 542.

While the applicability of qualified immunity is a fact-specific inquiry, it may be established at

the motion-to-dismiss stage if it is "based on facts appearing on the face of the complaint."

*McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004).

Plaintiff has cited to no Supreme Court or Second Circuit decision, and this Court has

located none, which addresses the constitutional question of whether preventing workers from

speaking in non-English languages in the workplace may – when done under color of state law – be considered a violation of a First Amendment right, let alone the parameters of that right as applied to detainees or prisoners.  (*See generally* Discussion, *supra*, at Section (II)(B)(2)(a)(i); *see also Charles W. v. Maul*, 214 F.3d 350, 353 (2d Cir. 2000) ("A right may be said to be clearly established when it has been recognized either by the Supreme Court or by the applicable Circuit Court.").)  Indeed, even broadening its search beyond the workplace context, this Court has located no controlling case authority addressing a more general right of an individual to speak in a non-English language.[16]  This Court therefore cannot conclude that Plaintiff had a "clearly established" right to speak Spanish while carrying out his duties in the Facility's kitchen, so as to deny Bishop qualified immunity for her alleged conduct.

Unsurprisingly, given the dearth of case law on this topic, other courts that have addressed similar claims regarding the use of non-English language by detainees or prisoners have reached the same conclusion.  *See Allah*, 506 F. Supp. 2d at 184 ("assuming *arguendo* that prison inmates have some right to communicate with each other in a non-English language, the parameters of that right are far from clear"); *Reyes,* 2012 WL 718952, at *7 (dismissing First

---

[16] As noted above, in *Arizonans for Official English*, 520 U.S. 43, the Supreme Court declined (on standing grounds) to reach the merits of a claim challenging, under the First Amendment, a state law that mandated state employees to speak only English on the job.  Other Supreme Court cases involving the alleged deprivation of constitutional rights based on the refused use of non-English language have arisen from situations bearing little resemblance to the situation presented here.  *See Lau v. Nichols*, 414 U.S. 563 (1974) (holding that a state school district's failure to accommodate the needs of students who did not speak English constituted a violation of equal protection guarantees); *Meyer v. Nebraska*, 262 U.S. 390 (1923) (invalidating, on due-process grounds, a state law banning the teaching of foreign language to schoolchildren).  Similarly, on the issue of the prohibition of foreign-language use, the Second Circuit has not issued any First Amendment ruling that could be generally applicable to this case.  *See, e.g.*, *Soberal-Perez v. Heckler*, 717 F.2d 36 (2d Cir. 1983) (affirming dismissal of equal-protection claim made by Hispanic plaintiffs whose Social Security benefits were allegedly denied because of the defendant Secretary's failure to provide notices and oral instructions in Spanish).

Amendment claim on qualified immunity grounds, noting that "few courts have addressed whether prohibitions on the speaking of a foreign language in the workplace violates the First Amendment . . . [and] no case in this or any other circuit has ruled that such a prohibition in the prison work context violates the First Amendment"); *see also Kikumura*, 28 F.3d at 596 ("Whatever we might think about the constitutionality of [a blanket ban on incoming mail in Japanese], it surely is not 'clearly established' that [the Warden's] actions violated Kikumura's constitutional rights.").

Finally, Plaintiff's implicit suggestion that on-point precedent is not needed here because Bishop's First Amendment violation was obvious (*see* Pl. Opp., at ECF 4 (arguing that Bishop "clearly violated the law when she discriminated against [Plaintiff]" for speaking Spanish)) does not help him.  It is true that "a plaintiff may overcome the qualified immunity defense in the absence of precedent [] when the constitutional violation is 'obvious.'" *Wagschal,* 442 F. Supp. 3d at 627.  As this Court has discussed, however, there is little case law addressing the question of whether any person has a constitutional right to speak a non-English language in the workplace, let alone whether a prisoner or detainee necessarily retains those rights in custody. Further, given that, on the few occasions where they have been addressed, "language bans" in the prison workplace have been upheld, it cannot be said that Bishop's conduct was so egregious or such a significant infringement of Plaintiff's rights that it was blatantly unconstitutional.  Thus, this is not a case where the Court could reasonably conclude that Bishop "obviously" violated the Constitution when she directed Plaintiff not to speak Spanish.  *See Wagschal,* 442 F. Supp. 3d at 627.[17]

---

[17] Given that Plaintiff complains that Bishop "discriminated" against him by prohibiting him from speaking English in the MDC workplace (Pl. Opp., at ECF 4), it should also be noted that the law would also not support a finding that such alleged conduct was violative of

In sum, even assuming that Plaintiff has plausibly pleaded that Bishop violated a First Amendment right by ordering him not to speak Spanish while working in the MDC kitchen, Plaintiff cannot prevail on that claim because of Bishop's qualified immunity.  Regardless of whether this is a desirable result, this Court is bound to follow the qualified-immunity doctrine as articulated by the Supreme Court, and, under that doctrine, this is the result that this Court is constrained to reach.  I therefore respectfully recommend that Plaintiff's First Amendment claim against Bishop, based on Plaintiff's allegations that Bishop refused to allow him to speak Spanish during his work in the Facility kitchen, be dismissed with prejudice.

> **b.**     **Plaintiff's Claim That Bishop Violated His
> First Amendment Rights by Retaliating Against
> Him For Filing a Grievance Regarding Her Conduct**

As noted above, to the extent Plaintiff is claiming, under Section 1983, that he suffered unlawful retaliation for having filed a grievance about Bishop's conduct, his Complaint and opposition papers suggest that he is principally asserting that claim against the City. Nonetheless, as this Court has liberally construed the Complaint to raise this claim against Bishop as well, this Court will address that claim here.

As to such a claim, this Court notes, at the outset, that Defendants appear to have misread the Complaint, as they argue, in their moving brief, that Plaintiff has failed to plead that he was retaliated against for speaking Spanish in the kitchen.  (Def. Mem., at 9-10.)  This reading of the Complaint does not appear to be suggested anywhere in either the Complaint itself or the Plaintiff's briefing, both of which make clear that Plaintiff claims he was retaliated against for filing a grievance against Bishop.  (*See* Compl., at ECF 4 (alleging "First Amendment for

---

Plaintiff's "clearly established" right to equal protection, under the 14th Amendment.  (*See* cases discussed *supra*, at n.16.)

Retaliation *from filing grievance*" (emphasis added)); *id.*, at ECF 17 (alleging "First Amendment

for Retaliation *for filing formal grievance*" (emphasis added)); *id.*, at ECF 25 (alleging that

Plaintiff "found out that *since [he] filed the grievance*" he was removed from kitchen duties and

further alleging "retaliation *for filing [a] grievance against [] Bishop*" (emphasis added)); ECF

27 (alleging a violation of his right "to be free from retaliation *for the filing of a formal*

*grievance* (emphasis added)); *see also* Pl. Opp., at ECF 3 (noting that "there is a grievance on

file in which the plaintiff was retaliated against for using such against [] Bishop" and asserting

that "plaintiff was retaliated against for filing a formal grievance against [Bishop]").)

Defendants do not point to any specific language in the Complaint that supports their

interpretation of Plaintiff's claims, and this Court has located none.  As a result, much of

Defendants' opening briefing on this point is of little to no value in analyzing Plaintiff's claim,

and their characterization of Plaintiff's opposition as raising a "new theory of the case" or "new

claim" of retaliation (Def. Reply Mem., at 3-4) is simply incorrect.

  Turning to the claim that Plaintiff has actually attempted to plead, the law provides that,

"[t]o state a First Amendment retaliation claim sufficient to withstand a motion to dismiss, a

plaintiff must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant

took adverse action against the plaintiff, and (3) that there was a causal connection between the

protected speech and the adverse action."  *Dolan v. Connolly,* 794 F.3d 290, 294 (2d Cir. 2015)

(citing *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009)).  As set out above, to make out a

Section 1983 claim against an individual defendant, the plaintiff must also plead that the

defendant had "direct and personal involvement in the alleged constitutional deprivation."

*Tripathy*, 2020 WL 3578198, at *4; *see* Discussion *supra*, at Section (II)(B)(1).

The Court may quickly dispose of Defendants' argument (made in its opening brief, based on its misunderstanding of Plaintiff's claim) that Plaintiff has failed to plead he engaged in protected speech.  (*See* Def. Mem., at 9.)  When addressing, on reply, Plaintiff's *actual* retaliation claim, Defendants make no suggestion that a grievance should not be considered protected speech (*see generally* Def. Reply Mem., at 3-4) – with good reason, as "it is well established that retaliation against a prisoner for pursuing a grievance . . . is actionable under [Section] 1983."  *Dolan,* 794 F.3d at 294 (internal quotation marks and citation omitted).  Based on this settled law, Plaintiff has sufficiently pleaded the first element of his retaliation claim.  As for the second element, Defendants do not challenge that Plaintiff's removal from kitchen duties may be considered an "adverse action" (*see* Def. Mem., at 9-10; Def. Reply Mem., at 3-4), seemingly conceding the point, at least for purposes of this motion.

Defendants' chief argument appears to be that Plaintiff has failed to plead facts that could satisfy the third element – the presence of a causal connection between the protected speech and the adverse action.  On this point, Defendants initially assert (again, seemingly focusing, wrongly, on Plaintiff's speaking in Spanish, rather than his filing of a grievance) that Plaintiff has "fail[ed] to allege any specific facts demonstrating a causal connection, let alone a substantial motivating factor, between the speech and the retaliatory act."  (Def. Mem., at 9-10.)  Then, in reply (addressing the grievance), Defendants state "the only factor [Plaintiff] has alleged in support of a causal connection . . . is a temporal one" (Def. Reply Mem., at 4), which, they contend, is insufficient, standing alone, to support a retaliation claim (*id.*).  This argument is both legally and factually wrong.  First, at the motion-to-dismiss stage, temporal proximity (which Defendants appear to concede exists here, and would be hard-pressed to deny, given that the grievance and the alleged retaliatory act occurred a mere week apart) may, standing alone, be

sufficient to support a causal connection for purposes of a retaliation claim.  *Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir. 2009) (reversing district court's dismissal of First Amendment retaliation claim where only fact alleged to support a causal connection was temporal proximity between the grievance and retaliatory act).[18]  Second, temporal proximity is not, in fact, the only allegation in the Complaint that could plausibly give rise to an inference of a causal connection between Plaintiff's grievance and his removal from kitchen duties; Plaintiff also alleges that he was expressly told that he was "fired since [he] filed the grievance against [] Bishop."  (Compl., at ECF 25.)  Taken together, this Court concludes that Plaintiff's allegations are sufficient, at this stage, to raise a plausible inference of retaliatory intent.[19]  *See, e.g., Burton v. Lynch,* 664 F. Supp. 2d 349, 368 (S.D.N.Y. 2009) (temporal proximity, in conjunction with other facts to corroborate claim of retaliation, was sufficient to plead *prima facie* case of First Amendment retaliation).

Defendants also argue, albeit in a cursory manner, that Plaintiff's retaliation claim must fail because he has not specifically pleaded that Bishop is the one who committed the alleged retaliatory act.  (Def. Mem., at 10; Def. Reply Mem., at 4.)  As Defendants correctly note, the

---

[18] Defendants' sole case in support of their proposition to the contrary is a summary-judgment case, and therefore inapposite.  (Def. Mem., at 4 (citing *Gill v. DeFrank,* No. 98cv7851 (JSR) (AJP), 2000 WL 270854, at *16 (S.D.N.Y. Mar. 9, 2000), *report and recommendation adopted as modified,* 2000 WL 877012 (S.D.N.Y. June 30, 2000)).)  That temporal proximity may, standing alone, be insufficient to raise a triable issue of fact at the summary judgment stage does not require a conclusion that temporal proximity alone cannot, at the pleading stage, support a plausible claim for relief.

[19] Defendants also argue in passing that there was a "proper reason" for Plaintiff's removal from the kitchen, as "it would be entirely appropriate for MDC to reassign a prisoner who has made a grievance away from the C.O. against whom he has filed the grievance."  (Def. Mem., at 4.)  There is nothing in the Complaint, however, to suggest that Plaintiff was reassigned to a different job, much less that the person who made the decision to reassign him did so for a non-retaliatory reason.  Such facts might be adduced during discovery, but, at this stage, as they have merely been suggested in Defendants' brief, they cannot defeat Plaintiff's claim.

Complaint does not contain any factual allegations that plausibly suggest that Bishop made the decision to terminate Plaintiff's work assignment, or that she suggested, recommended, or otherwise participated in that decision in any way (*see generally* Compl.), and, in the absence of any such allegations, Plaintiff's claim cannot survive as pleaded, *see Littlejohn,* 795 F.3d at 314 (dismissing Section 1983 claims against plaintiff's work supervisors where plaintiff failed to allege supervisors were "personally involved" in her demotion).

It is possible, however, that Plaintiff could plead facts giving rise to a plausible inference that Bishop was personally involved in the decision to remove him from his kitchen job, and, for this reason, Plaintiff should be permitted to attempt to cure this defect through amendment.  On this point, this Court notes that, although Defendants generally argue that Bishop is entitled to qualified immunity on "all" of Plaintiff's claims (Def. Mem., at 16-18), they do not actually raise a qualified-immunity argument with respect to a retaliation claim premised on Plaintiff's filing of a grievance, as opposed to his speaking Spanish (*see id.*).  Nor could Defendants convincingly argue that Bishop would be entitled to qualified immunity on a claim that she unlawfully terminated Plaintiff's job because he filed a grievance against her, as it has been clearly established that an officer may not retaliate against inmates for filing grievances.  *See Vincent v. Sitnewski,* 117 F. Supp. 3d 329, 342 (S.D.N.Y. 2015).  Thus, should Plaintiff be able to plead Bishop's personal involvement, such amendment would not be futile.

For the reasons set forth above, this Court concludes that Plaintiff's First Amendment retaliation claim against Bishop should be dismissed, but without prejudice to replead.  Further, if Plaintiff has reason to believe that individuals other than Bishop were personally involved in the termination of his work assignment, then he should also be given the opportunity to amend

his Complaint in order to name such other individuals as defendants, and to plead the nature of their involvement in the claimed violation.

### 3.   Plaintiff's Section 1983 Claims Against the City

Having (1) assumed that Plaintiff has pleaded a plausible First Amendment claim based on Bishop's order that he not speak Spanish in the workplace, but concluded that this claim must be dismissed, as against Bishop, on qualified immunity grounds, and (2) found that Plaintiff has pleaded all the elements of a First Amendment retaliation claim, but concluded that this claim must also be dismissed, as against Bishop, for failure to plead her personal involvement in the alleged violation, this Court now turns to Plaintiff's claims against the City.  For the reasons set forth below, this Court concludes that these claims do not satisfy the requirements of *Monell* and should be dismissed on that basis, without prejudice to amend.

Before discussing the *Monell* defects in Plaintiff's pleading, this Court notes, as an initial matter, that neither of the defects noted above with respect to Plaintiff's claims against *Bishop* would absolve the City of potential Section 1983 liability.  First, any qualified immunity to which an individual defendant may be entitled would not extend to the City.  *See Askins v. Doe No. 1,* 727 F.3d 248, 254 (2d Cir. 2013) (discussing interplay between individual and municipal liability, and clarifying that dismissal of a claim against an individual municipal actor based on qualified immunity is "irrelevant to the liability of the municipality").  As explained by the Second Circuit, municipalities simply "have no immunity from damages for liability flowing from their constitutional violations."  *Id.* (internal quotation marks and citations omitted). Rather,

> The doctrine that confers qualified immunity on individual state or municipal actors is designed to ensure that the persons carrying out governmental responsibilities will perform their duties boldly and energetically without having to worry that their actions, which they

> reasonably believed to be lawful at the time, will later subject them
> to liability on the basis of subsequently developed legal doctrine.
> . . . That policy, however, has no bearing on the liability of
> municipalities. Municipalities are held liable if they adopt customs
> or policies that violate federal law and result in tortious violation
> of a plaintiff's rights, regardless of whether it was clear at the time
> of the adoption of the policy or at the time of the tortious conduct
> that such conduct would violate the plaintiff's rights.

*Id*. (citations omitted); *see also Pearson,* 555 U.S. at 243, (noting that "the [Section 1983]

plaintiff will presumably take into account the possibility that the individual defendant will be

held to have qualified immunity, and presumably the plaintiff will seek damages from the

municipality as well as the individual employee").

Second, even if Plaintiff were unable to plead that Bishop herself – or, for that matter,

any other particular employee or employees of the City – made the decision to terminate his job

in the MDC kitchen, he could still proceed against the City, provided he is able to plead facts

giving rise to a plausible inference that the decision was made pursuant to an unlawful municipal

policy or custom. *See Askins*, 727 F.3d at 253 ("It suffices to plead and prove against the

municipality that municipal actors committed the tort against the plaintiff and that the tort

resulted from a policy or custom of the municipality."). Indeed, a plaintiff "need not sue the

individual tortfeasors at all, but may proceed solely against the municipality." *See id*. (citation

omitted). Thus, if Plaintiff could plead that it was a standard practice for City employees to

terminate the work assignment of an inmate or detainee who filed a grievance against that inmate

or detainee's work supervisor, and that this practice was followed in his case, then Plaintiff could

state a plausible *Monell* claim against the City, regardless of whether he can – or chooses to –

name the actor(s).

Still, to proceed on his Section 1983 claims against the City, Plaintiff must plead the

*Monell* requirements, and, at this point, he has not done so. Specifically, Plaintiff must

adequately plead that an official policy, custom, or practice of the City caused the deprivations of his federal constitutional or statutory rights. *See Monell*, 438 U.S. at 694. Here, Plaintiff does not allege that either Bishop's order that he not speak Spanish, or his removal from kitchen duties after the filing of his grievance, was the result of, or was effected in accordance with, any policy, custom, or practice of the City. (*See generally* Compl.)

Certainly, Plaintiff has not identified any formal policy, "officially endorsed" by the City, *Berg,* 343 F. Supp. 3d at 425 n.2, that either forbids the speaking of Spanish by inmates or detainees in a facility workplace, or that dictates the removal of inmates or detainees from assigned work duties based on their filing of grievances.[20] In fact, Plaintiff suggests, in his Complaint, that the City's *lack* of an appropriate policy was the cause of his injury (Compl., at ECF 27 (referring to the City's "lack of policies")), but, under *Monell,* a municipality's failure to put a formal policy in place to prevent unlawful conduct is not the same thing as an actionable policy, *see Zachary v. City of Newburgh*, No. 13cv5737 (VB), 2014 WL 1508705, at *5 (S.D.N.Y. Apr. 1, 2014) ("[T]he absence of a policy is not a policy and is not actionable under *Monell* . . . ." (citing *Monell,* 436 U.S. at 690-91)). Moreover, Plaintiff has not pleaded that the claimed violation of his rights – either with respect to his being prohibited from speaking Spanish, or his being terminated from his job for retaliatory reasons – were "actions taken or decisions made by [City] officials responsible for establishing municipal policies," *Berg,* 343 F. Supp. 3d at 425 n.2, or that either claimed violation resulted from "a practice so persistent and

---

[20] In his Opposition, Plaintiff cites to several laws, which, as characterized by Plaintiff, were implemented "to deter any kind of retaliation and discrimination." (Pl. Opp., at ECF 4.) Plaintiff, however, misunderstands *Monell*, which requires not that the City be subject to anti-discrimination or anti-retaliation policies, but rather that the City has implemented an *unlawful* policy, custom, or practice that has *caused* the harm for which Plaintiff seeks redress. *See Monell*, 438 U.S. at 694. Plaintiff has failed to allege the existence of any such policy here.

widespread that it constitutes a custom or usage and implies the constructive knowledge of policy-making officials," *id*. (internal quotation marks and citation omitted)

Plaintiff does, in his Complaint, make a passing reference to an alleged "failure" by the City "to properly train and supervise." (Compl., at ECF 27.) Although a failure to train or supervise can provide a basis for municipal liability under Section 1983, *see Berg,* 343 F. Supp. 3d at 425 n.2, such a failure must be alleged to exist "to such an extent that it amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact," *id*. (internal quotation marks and citation omitted). Thus, a plaintiff must plead more than conclusory allegations in support of a *Monell* claim based on such failures. *See Triano v. Town of Harrison, NY,* 895 F. Supp. 2d 526, 538 (S.D.N.Y. 2012). In order to plead an adequate *Monell* claim based on a failure to train, a plaintiff must allege that the municipality acted "with deliberate indifference," *id.* at 540, and, similarly, in order to plead an adequate claim based on a failure to supervise, a plaintiff must allege that "the need for more or better supervision was obvious" and that the defendant "made no meaningful attempt to prevent the constitutional violation," *id.* at 539 (internal quotation marks, alterations, and citation omitted). In this case, Plaintiff's single conclusory allegation does not provide any facts from which this Court could plausibly infer that the City did not, in fact, train or supervise Bishop (or other City officers or employees) with respect to the particular constitutional violations alleged, let alone that the City was "deliberately indifferen[t]" to a gap in training, or that the need for supervision was "obvious." (*See generally* Compl.) Plaintiff's conclusory allegation regarding insufficient training and supervision therefore cannot save his *Monell* claims against the City.

For these reasons, I recommend that Plaintiff's claims against the City be dismissed. I further recommend, however, that this dismissal be without prejudice, as it is possible that

Plaintiff may be able to allege additional facts that could support a plausible inference that the claimed violations of his First Amendment rights resulted from a City policy, custom, or practice, and he should therefore be afforded an opportunity to amend his Complaint, so as to plead such allegations.

## **CONCLUSION**

For all of the foregoing reasons, I respectfully recommend that Defendants' motion to dismiss (Dkt. 23) be granted as follows:

1.    Plaintiff's Title VII claim should be dismissed with prejudice, on the grounds that Plaintiff cannot be considered to have been a City "employee" under Title VII as a matter of law;[21]

2.    Plaintiff's Section 1983 claim that his First Amendment rights were violated by Bishop's prohibiting him from speaking Spanish in the MDC workplace should be:

   a.    dismissed with prejudice, as against Bishop, on qualified-immunity grounds, and

   b.    dismissed without prejudice, as against the City, with leave for Plaintiff to amend his Complaint to plead, under *Monell*, that this alleged violation occurred as the result of a municipal policy, custom, or practice; and

3.    Plaintiff's Section 1983 claim that his First Amendment rights were violated by his being terminated from his work assignment at the MDC in retaliation for his having filed a grievance against Bishop claim should be

   a.    dismissed without prejudice, as against Bishop, with leave for Plaintiff to amend his Complaint to allege

_____

[21] As discussed above, if the Court disagrees with this conclusion, and determines that Plaintiff may be considered to have been an "employee" for purposes of Title VII, then I would still recommend that Plaintiff's Title VII claim against the City be dismissed – but without prejudice to amend, so as to give Plaintiff the opportunity to plead that he was discriminated against in his employment based on his membership in a protected class (*i.e.*, his race, national origin, or ethnicity), rather than for speaking a non-English language.

>          Bishop's personal involvement in his termination;
>          and
>
>   b.     dismissed without prejudice, as against the City,
>          with leave for Plaintiff to amend his Complaint to
>          plead, under *Monell*, that the allegedly retaliatory
>          conduct was pursuant to a municipal policy,
>          custom, or practice.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6 (allowing three (3) additional days for service by mail). Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Lewis J. Liman, United States Courthouse, 500 Pearl Street, Room 2204, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Liman. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

If Plaintiff does not have access to cases cited herein that are reported only on Westlaw or LexisNexis, he may request copies from Defendants' counsel. *See* Local Civ. R. 7.2 ("Upon request, counsel shall provide the *pro se* litigant with copies of [cases and other authorities that are unpublished or reported exclusively on computerized databases that are] cited in a decision of the Court and were not previously cited by any party").

The Clerk of Court is directed to mail a copy of this Report and Recommendation to

Plaintiff, at the address listed on the Docket for this case and shown below.

Dated:  New York, New York
         August 17, 2020

Respectfully submitted,

DEBRA FREEMAN
United States Magistrate Judge

Copies to:

Mr. Anibal K. Quinones
DIN No. 17R0361
Orleans Correctional Facility
3531 Gaines Basin Road
Albion, NY 14411-9199

Defendants' counsel (via ECF)